**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| HOMEAWAY.COM, INC.; AIRBNB INC., | No. 18-55367 |
| *Plaintiffs-Appellants*, | |
| | D.C. Nos. |
| | 2:16-cv-06641- |
| v. | ODW-AFM |
| | 2:16-cv-06645- |
| CITY OF SANTA MONICA, | ODW-AFM |
| *Defendant-Appellee.* | |

| | |
|---|---|
| HOMEAWAY.COM, INC., | No. 18-55805 |
| *Plaintiff-Appellant*, | |
| | D.C. Nos. |
| and | 2:16-cv-06641- |
| | ODW-AFM |
| AIRBNB INC., | 2:16-cv-06645- |
| *Plaintiff*, | ODW-AFM |
| v. | |
| CITY OF SANTA MONICA, | |
| *Defendant-Appellee.* | |

| | |
|---|---|
| AIRBNB INC., | No. 18-55806 |
| *Plaintiff-Appellant*, | |
| | D.C. No. |
| v. | 2:16-cv-06645- |
| | ODW-AFM |
| CITY OF SANTA MONICA, | |
| *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted October 12, 2018
Pasadena, California

Filed March 13, 2019

Before:  Mary M. Schroeder and Jacqueline H. Nguyen,
Circuit Judges, and Michael H. Simon,* District Judge.

Opinion by Judge Nguyen

---

* The Honorable Michael H. Simon, United States District Judge for
the District of Oregon, sitting by designation.

## SUMMARY[**]

---

### Civil Rights

The panel affirmed the district court's dismissal, for failure to state a claim, of a complaint brought by HomeAway.com and Airbnb Inc. challenging the City of Santa Monica's Ordinance 2535, which imposes various obligations on companies that host online platforms for short-term vacation rentals.

The Ordinance, as amended in 2017, imposes four obligations on hosting platforms: (1) collecting and remitting Transient Occupancy Taxes; (2) regularly disclosing listings and booking information to the City; (3) refraining from booking properties not licensed and listed on the City's registry; (4) and refraining from collecting a fee for ancillary services.

The panel rejected plaintiffs' assertion that the Ordinance violated the Communications Decency Act of 1996, 47 U.S.C. § 230 because it required them to monitor and remove third-party content, and therefore interfered with federal policy protecting internet companies from liability for posting third-party content. The panel stated that the Ordinance prohibits processing transactions for unregistered properties. It does not require the Platforms to review the content provided by the hosts of listings on their websites. Rather, the panel noted that the only monitoring that appeared necessary in order to comply with the Ordinance

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

related to incoming requests to complete a booking transaction—content that, while *resulting from* the third-party listings, was distinct, internal, and nonpublic.   The panel concluded that the Ordinance was not inconsistent with the Communications Decency Act, and therefore was not expressly preempted by its terms.   The panel further concluded that the Ordinance would not pose an obstacle to Congress's aim to encourage self-monitoring of third-party content, and therefore obstacle preemption did not preclude Santa Monica from enforcing the Ordinance.

The panel held that the Ordinance did not implicate speech protected by the First Amendment, concluding that the Ordinance's prohibitions regulate nonexpressive conduct, specifically booking transactions, and do not single out those engaged in expressive activity.

## COUNSEL

Donald B. Verrilli, Jr. (argued) and Chad Golder, Munger, Tolles & Olson LLP, Washington, D.C.; Joseph W. Cotchett and Alexandra P. Summer, Cotchett, Pitre & McCarthy, LLP, Santa Monica, California; Jonathan H. Blavin and Joshua Patashnik, Munger, Tolles & Olson LLP, San Francisco, California; John B. Major, Munger, Tolles & Olson, Los Angeles, California; for Plaintiff-Appellant Airbnb, Inc.

Stephen M. Rummage and Ambika K. Doran, Davis Wright Tremaine LLP, Seattle, Washington, for Plaintiff-Appellant HomeAway.com, Inc.

George S. Cardona (argued), Deputy City Attorney; Lane Dilg, City Attorney; Yibin Shen, Chief Deputy City

Attorney; Heidi Von Tongeln and  Michael R. Cobden, Deputy City Attorneys; Santa Monica City Attorney's Office, Santa Monica, California, for Defendant-Appellee.

David Salmons, Bryan Killian, and James Nelson, Morgan, Lewis & Bockius LLP, Washington, D.C., for Amici Curiae Chris Cox and NetChoice.

Catherine R. Gellis, Esq., Sausalito, California, for Amicus Curiae Floor64, Inc. d/b/a The Copia Institute.

Ian C. Ballon and Lori Chang, Greenberg Traurig, LLP, Los Angeles, California, for Amici Curiae Ebay Inc., Glassdoor, Inc., Lyft, Inc., Offerup, Inc., Taskrabbit, Inc., Thumbtack, Inc., Uber Technologies, Inc., and Upwork, Inc.

Christi Hogin, Best Best & Krieger LLP, Manhattan Beach, California, for Amici Curiae League of California Cities, International Municipal Lawyers Association, and California State Association of Counties.

Jeremy B. Rosen, Eric S. Boorstin, and Ryan C. Chapman, Horvitz & Levy LLP, Burbank, California; Michael T. Williams and Allison R. Mclaughlin, Wheeler Trigg O'Donnell LLP, Denver, Colorado; David C. Frederick, Brendan J. Crimmins, and Rachel P. May, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., for Amicus Curiae Apartment Investment and Management Company.

Heidi Palutke, Sacramento, California, for Amicus Curiae California Apartment Association.

Edward M. Schulman, Ballston Tower, Arlington, Virginia, for Amicus Curiae AvalonBay Communities, Inc.

Gary S. Kessler, Kulik Gottesman Siegel & Ware LLP, Sherman Oaks, California, for Amicus Curiae Community Associations Institute.

Abbey R. Stemler and Matthew C. Turk, Indiana University Kelley School of Business, Bloomington, Indiana; Jahan C. Sagafi and Relic Sun, Outten & Golden LLP, San Francisco, California; Peter Romer-Friedman, Outten & Golden LLP, Washington, D.C., for Amici Curiae Internet, Business, and Local Government Law Professors.

Richard G. McCracken and Paul L. More, McCracken, Stemerman & Holsberry, LLP, San Francisco, California, for Amicus Curiae UNITE HERE International Union.

Dennis J. Herrera, San Francisco City Attorney; Christine Van Aken, Chief of Appellate Litigation; Yvonne R. Meré, Chief of Complex and Affirmative Litigation; Sara J. Eisenberg, Deputy City Attorney; San Francisco, California for Amicus Curiae City and County of San Francisco.

Karl A. Racine, Attorney General for the District of Columbia, Washington, D.C., for Amicus Curiae District of Columbia.

Andre M. Davis, City Solicitor, City of Baltimore, Baltimore, Maryland, for Amicus Curiae Mayor and City Council of Baltimore.

Zach Klein, Columbus City Attorney, Columbus, Ohio, for Amicus Curiae City of Columbus.

Barbara J. Parker, Oakland City Attorney; Maria Bee, Special Counsel; Erin Bernstein, Supervising Deputy City

Attorney; Oakland, California; for Amicus Curiae City of Oakland.

Peter S. Holmes, Seattle City Attorney, Seattle, Washington, for Amicus Curiae City of Seattle.

Jill E. Habig, Founder & President; Joanna Pearl, Legal Director; Oakland, California; for Amicus Curiae Public Rights Project, A Project of Tides Center.

## OPINION

NGUYEN, Circuit Judge:

Located on the coast of Southern California, the city of Santa Monica consists of only about eight square miles but serves 90,000 residents and as many as 500,000 visitors on weekends and holidays.  Similar to other popular tourist destinations, Santa Monica is struggling to manage the disruptions brought about by the rise of short-term rentals facilitated by innovative startups such as Appellants HomeAway.com, Inc. and Airbnb Inc. (the "Platforms"). Websites like those operated by the Platforms are essentially online marketplaces that allow "guests" seeking accommodations and "hosts" offering accommodations to connect and enter into rental agreements with one another.[1] As of February 2018, Airbnb had approximately 1,400 listings in Santa Monica, of which about 30 percent are in

---

[1] The Platforms do not own, lease, or manage any of the properties listed on their websites, nor are they parties to the rental agreements. Instead, the content provided alongside the listings—such as description, price, and availability—are provided by the hosts.  For their services, the Platforms collect a fee from each successful booking.

the "coastal zone" covered by the California Coastal Act, while HomeAway.com had approximately 300 live listings in Santa Monica, of which approximately 40 percent are in the coastal zone.

Santa Monica's council reported that the proliferation of short-term rentals had negatively impacted the quality and character of its neighborhoods by "bringing commercial activity and removing residential housing stock from the market" at a time when California is already suffering from severe housing shortages.  In response, the city passed an ordinance regulating the short-term vacation rental market by authorizing licensed "home-sharing" (rentals where residents remain on-site with guests) but prohibiting all other short-term home rentals of 30 consecutive days or less.

]The Platforms filed suit, alleging that the city ordinance is preempted by the Communications Decency Act and impermissibly infringes upon their First Amendment rights. The district court denied preliminary injunctive relief, and dismissed the Platforms' complaints for failure to state a claim under the Communications Decency Act and the First Amendment.  We affirm.

## BACKGROUND

In May 2015, Santa Monica passed its initial ordinance regulating the short-term vacation rental market by authorizing licensed "home-sharing" (rentals where residents remain on-site with guests) but prohibiting all other forms of short-term rentals for 30 consecutive days or less. Santa Monica Ordinance 2484 (May 12, 2015), *codified as amended*, Santa Monica Mun. Code §§ 6.20.010–6.20.100. The ordinance reflected the city's housing goals of "preserving its housing stock and preserving the quality and character of its existing single and multi-family residential

neighborhoods." *Id.* As originally enacted, the ordinance prohibited hosting platforms from acting to "undertake, maintain, authorize, aid, facilitate or advertise any Home-Sharing activity" that was not authorized by the city. Hosting platforms also were required to collect and remit taxes, and to regularly disclose listings and booking information to the city.

The Platforms each filed a complaint in the Central District of California challenging the initial ordinance, and the district court consolidated the cases for discovery and pretrial matters. On September 21, 2016, the parties stipulated to stay the case while the city considered amendments to the local ordinance. During the stay period, the district court for the Northern District of California denied a preliminary injunction requested by the plaintiffs in a separate case challenging a similar ordinance in San Francisco. *See Airbnb Inc. v. City & County of San Francisco*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016). That case ended in a settlement in which the Platforms agreed to comply with an amended version of San Francisco's ordinance that prohibited booking unlawful transactions but provided a safe harbor wherein any platform that complies with the responsibilities set out in the Ordinance will be presumed to be in compliance with the law.

In January 2017, Santa Monica likewise amended its own ordinance. The version challenged here, Ordinance 2535 (the "Ordinance"), retains its prohibitions on most types of short-term rentals, with the exception of licensed home-shares. In addition, the Ordinance imposes four obligations on hosting platforms directly: (1) collecting and remitting "Transient Occupancy Taxes," (2) disclosing certain listing and booking information regularly, (3) refraining from completing any booking transaction for

properties not licensed and listed on the City's registry, and (4) refraining from collecting or receiving a fee for "facilitating or providing services ancillary to a vacation rental or unregistered home-share." If a housing platform operates in compliance with these obligations, the Ordinance provides a safe harbor by presuming the platform to be in compliance with the law. Otherwise, violations are punishable by a fine of up to $500 and/or imprisonment for up to six months.

After the district court lifted the stay, the Platforms amended their complaint to challenge the revised ordinance and moved for a preliminary injunction. Santa Monica moved to dismiss the amended complaint. The court denied the Platforms' motion for preliminary injunctive relief and subsequently granted Santa Monica's motion to dismiss on the ground that the Platforms failed to state a claim under federal law, including the Communications Decency Act of 1996 and the First Amendment. The district court also declined to exercise supplemental jurisdiction over their remaining state-law claims.[2] The Platforms timely appealed these decisions, and we consolidated the appeals.

---

[2] The Platforms do not appeal the district court's dismissal of other federal claims brought under the Fourth Amendment and the Stored Communications Act. Similarly, they do not challenge the court's decision not to exercise supplemental jurisdiction over the state-law claims under the California Coastal Act if we affirm the dismissal of their federal claims. Because we affirm the district court's dismissal, we need not consider the state-law claims. We deny Santa Monica's motion for judicial notice of its prior enforcement actions because the dispute as to its prior actions relates only to the state-law claims.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's order of dismissal de novo, "accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Yagman v. Garcetti*, 852 F.3d 859, 863 (2017) (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016)).

## DISCUSSION

## I. Communications Decency Act

The Communications Decency Act of 1996 ("CDA" or the "Act"), 47 U.S.C. § 230, provides internet companies with immunity from certain claims in furtherance of its stated policy "to promote the continued development of the Internet and other interactive computer services." *Id.* § 230(b)(1). Construing this immunity broadly, the Platforms argue that the Ordinance requires them to monitor and remove third-party content, and therefore violates the CDA by interfering with federal policy protecting internet companies from liability for posting third-party content. Santa Monica, on the other hand, argues that the Ordinance does not implicate the CDA because it imposes no obligation on the Platforms to monitor or edit any listings provided by hosts. Santa Monica contends that the Ordinance is simply an exercise of its right to enact regulations to preserve housing by curtailing "incentives for landlords to evade rent control laws, evict tenants, and convert residential units into *de facto* hotels."

We begin our analysis with the text of the CDA. *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). Section 230(c)(1) states that "[n]o provider or user of an

interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1).  The CDA explicitly preempts inconsistent state laws: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

We have construed these provisions to extend immunity to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).  Only the second element is at issue here: whether the Ordinance treats the Platforms as a "publisher or speaker" in a manner that is barred by the CDA.  Although the CDA does not define "publisher," we have defined "publication" in this context to "involve[] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102 (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc)).

The Platforms offer two different theories as to how the Ordinance in fact reaches "publication" activities.  First, the Platforms claim that the Ordinance is expressly preempted by the CDA because, as they argue, it implicitly requires them "to monitor the content of a third-party listing and compare it against the City's short-term rental registry before allowing any booking to proceed."  Relying on *Doe v. Internet Brands*, 824 F.3d 846, 851 (9th Cir. 2016), the Platforms take the view that CDA immunity follows

whenever a legal duty "affects" how an internet company "monitors" a website.

However, the Platforms read *Internet Brands* too broadly. In that case, two individuals used the defendant's website to message and lure the plaintiff to sham auditions where she was drugged and raped. *Id.* at 848. We held that, where the website provider was alleged to have known independently of the ongoing scheme beforehand, the CDA did not bar an action under state law for failure to warn. *Id.* at 854. We observed that a duty to warn would not "otherwise affect how [the defendant] publishes or monitors" user content. *Id.* at 851. Though the defendant did, in its business, act as a publisher of third-party content, the underlying legal duty at issue did not seek to hold the defendant liable as a "publisher or speaker" of third-party content. *Id.* at 853; *see* 47 U.S.C. § 230(c)(1). We therefore declined to extend CDA immunity to the defendant for the plaintiff's failure-to-warn claim. *Internet Brands*, 824 F.3d at 854.

We do not read *Internet Brands* to suggest that CDA immunity attaches any time a legal duty might lead a company to respond with monitoring or other publication activities. It is not enough that third-party content is involved; *Internet Brands* rejected use of a "but-for" test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content. *Id.* at 853. We look instead to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content. *See id.* at 851, 853.

Here, the Ordinance does not require the Platforms to monitor third-party content and thus falls outside of the CDA's immunity. The Ordinance prohibits processing

transactions for unregistered properties.  It does not require the Platforms to review the content provided by the hosts of listings on their websites.  Rather, the only monitoring that appears necessary in order to comply with the Ordinance relates to incoming requests to complete a booking transaction—content that, while *resulting from* the third-party listings, is distinct, internal, and nonpublic.  As in *Internet Brands*, it is not enough that the third-party listings are a "but-for" cause of such internal monitoring.  *See* 824 F.3d at 853.  The text of the CDA is "clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content."  *Barnes*, 570 F.3d at 1100.  To provide broad immunity "every time a website uses data initially obtained from third parties would eviscerate [the CDA]."  *Barnes*, 570 F.3d at 1100 (quoting *Roommates.com*, 521 F.3d at 1171 (9th Cir. 2008) (en banc)).  That is not the result that Congress intended.

Nor could a duty to cross-reference bookings against Santa Monica's property registry give rise to CDA immunity.  While keeping track of the city's registry is "monitoring" third-party content in the most basic sense, such conduct cannot be fairly classified as "publication" of third-party content.  The Platforms have *no* editorial control over the registry whatsoever.  As with tax regulations or criminal statutes, the Ordinance can fairly charge parties with keeping abreast of the law without running afoul of the CDA.

Second, the Platforms argue that the Ordinance "in operation and effect . . . forces [them] to *remove* third-party content."  Although it is clear that the Ordinance does not expressly mandate that they do so, the Platforms claim that "common sense explains" that they cannot "leave in place a website chock-full of un-bookable listings."  For purposes of

our review, we accept at face value the Platforms' assertion that they will choose to remove noncompliant third-party listings on their website as a consequence of the Ordinance.[3] Nonetheless, their choice to remove listings is insufficient to implicate the CDA.

On its face, the Ordinance does not proscribe, mandate, or even discuss the content of the listings that the Platforms display on their websites. *See* Santa Monica Mun. Code §§ 6.20.010–6.20.100. It requires only that transactions involve licensed properties. We acknowledge that, as the Platforms explain in Airbnb's complaint and in the briefing on appeal, removal of these listings would be the best option "from a business standpoint." But, as in *Internet Brands*, the underlying duty "could have been satisfied without changes to content posted by the website's users." *See* 824 F.3d at 851. Even assuming that removing certain listings may be the Platforms' most practical compliance option, allowing internet companies to claim CDA immunity under these circumstances would risk exempting them from most local regulations and would, as this court feared in *Roommates.com*, 521 F.3d at 1164, "create a lawless no-man's-land on the Internet." We hold that the Ordinance is not "inconsistent" with the CDA, and is therefore not expressly preempted by its terms. *See* 47 U.S.C. § 230(e)(3).

Finally, the Platforms argue that, even if the Ordinance is not expressly preempted by the CDA, the Ordinance imposes "an obstacle to the accomplishment and execution

---

[3] The Platforms argued below that the district court must accept as true their allegation that they would "have to" monitor and screen listings. As a matter of law, the Ordinance does not require them to do so. Courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

of the full purposes and objectives of Congress." *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). Reading the CDA expansively, they argue that the Ordinance conflicts with the CDA's goal "to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation." *See* § 230(b)(2). We have consistently eschewed an expansive reading of the statute that would render unlawful conduct "magically . . . lawful when [conducted] online," and therefore "giv[ing] online businesses an unfair advantage over their real-world counterparts." *See Roommates.com*, 521 F.3d at 1164, 1164–65 n.15. For the same reasons, while we acknowledge the Platforms' concerns about the difficulties of complying with numerous state and local regulations, the CDA does not provide internet companies with a one-size-fits-all body of law. Like their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations concerning, for example, employment, tax, or zoning. Because the Ordinance would not pose an obstacle to Congress's aim to encourage self-monitoring of third-party content, we hold that obstacle preemption does not preclude Santa Monica from enforcing the Ordinance.

Fundamentally, the parties dispute how broadly to construe the CDA so as to continue serving the purposes Congress envisioned while allowing state and local governments breathing room to address the pressing issues faced by their communities. We have previously acknowledged that the CDA's immunity reaches beyond the initial state court decision that sparked its enactment. *See Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, which held an internet company liable for defamation when it removed some, but

not all, harmful content from its public message boards, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished)).  As the Platforms correctly note, the Act's policy statements broadly promote "the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation."  *See* 47 U.S.C. § 230(b)(2).  "[A] law's scope often differs from its genesis," and we have repeatedly held the scope of immunity to reach beyond defamation cases.  *Barnes*, 570 F.3d at 1101 (quoting *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008), *as amended* (May 2, 2008)) (citing cases applying immunity for causes of action including discrimination, fraud, and negligence).

At the same time, our cases have hewn closely to the statutory language of the CDA and have limited the expansion of its immunity beyond the protection Congress envisioned.  As we have observed, "the [relevant] section is titled 'Protection for "good Samaritan" blocking and screening of offensive material.'"  *Roommates.com*, 521 F.3d at 1163–64 (quoting 47 U.S.C. § 230(c)); *see also Internet Brands*, 824 F.3d at 852.  Congress intended to "spare interactive computer services [the] grim choice" between voluntarily filtering content and being subject to liability on the one hand, and "ignoring all problematic posts altogether [to] escape liability."  *Roommates.com*, 521 F.3d at 1163–64.  In contrast, the Platforms face no liability for the content of the bookings; rather, any liability arises only from unlicensed bookings.  We do not discount the Platforms' concerns about the administrative burdens of state and local regulations, but we nonetheless disagree that § 230(c)(1) of the CDA may be read as broadly as they advocate, or that we may ourselves expand its provisions beyond what Congress initially intended.

In sum, neither express preemption nor obstacle preemption apply to the Ordinance.  We therefore affirm the district court's dismissal for failure to state a claim under the CDA.

## II.  First Amendment

The Platforms also contend that the district court erred in dismissing their First Amendment claims.  They argue that, even if the plain language of the Ordinance only reaches "conduct," *i.e.*, booking unlicensed properties, the law effectively imposes a "content-based financial burden" on commercial speech and is thus subject to First Amendment scrutiny.  The district court concluded that the Ordinance "regulates conduct, not speech, and that the conduct banned . . . does not have such a 'significant expressive element' as to draw First Amendment protection."  We agree.

That the Ordinance regulates "conduct" is not alone dispositive.  The Supreme Court has previously applied First Amendment scrutiny when "'speech' and 'nonspeech' elements are combined in the same course of conduct."  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968).  But "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  While the former is entitled to protection, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  *Id.*

To determine whether the First Amendment applies, we must first ask the "threshold question [of] whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.'"  *Int'l Franchise*

*Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986)). A court may consider the "inevitable effect of a statute on its face," as well as a statute's "stated purpose." *Sorrell*, 564 U.S. at 565. However, absent narrow circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself. *See O'Brien*, 391 U.S. at 383 n.30. Because the conduct at issue—completing booking transactions for unlawful rentals—consists only of nonspeech, nonexpressive conduct, we hold that the Ordinance does not implicate the First Amendment.

First, the prohibitions here did not target conduct with "a significant expressive element." *See Arcara*, 478 U.S. at 706. Our decision in *International Franchise Ass'n* is analogous. There, the plaintiff challenged a minimum wage ordinance that would have accelerated the raising of the minimum wage to $15 per hour for franchise owners and other large employers. 803 F.3d at 389. In denying a preliminary injunction, the district court held that the plaintiffs were not likely to succeed on their First Amendment argument that the ordinance treated them differently based on their "speech and association" decisions to operate within a franchise relationship framework. *Id.* at 408–09. We agreed, concluding that the "business agreement or business dealings" were not conduct with a "significant expressive element." *Id.* at 408. Instead, "Seattle's minimum wage ordinance [was] plainly an economic regulation that [did] not target speech or expressive conduct." *Id.*

Similarly, here, the Ordinance is plainly a housing and rental regulation. The "inevitable effect of the [Ordinance] on its face" is to regulate nonexpressive conduct—namely,

booking transactions—not speech.  *See Sorrell*, 564 U.S. at 565.  As in *International Franchise Ass'n*, the "business agreement or business dealings" associated with processing a booking is not conduct with a "significant expressive element."  *See* 803 F.3d at 408 (citation and quotation marks omitted).  Contrary to the Platforms' claim, the Ordinance does not "require" that they monitor or screen advertisements.  It instead leaves them to decide how best to comply with the prohibition on booking unlawful transactions.

Nor can the Platforms rely on the Ordinance's "stated purpose" to argue that it intends to regulate speech.  The Ordinance itself makes clear that the City's "central and significant goal . . . is preservation of its housing stock and preserving the quality and nature of residential neighborhoods." As such, with respect to the Platforms, the only inevitable effect, and the stated purpose, of the Ordinance is to prohibit them from completing booking transactions for unlawful rentals.

As for the second prong of our inquiry, whether the Ordinance has the effect of "singling out those engaged in expressive activity," *Arcara*, 478 U.S. at 706–07, we conclude that it does not.  As the Platforms point out, websites like Craigslist "advertise the very same properties," but do not process transactions.  Unlike the Platforms, those websites would not be subject to the Ordinance, underscoring that the Ordinance does not target websites that post listings, but rather companies that engage in unlawful booking transactions.

Moreover, the incidental impacts on speech cited by the Platforms raise minimal concerns.  The Platforms argue that the Ordinance chills commercial speech, namely, advertisements for third-party rentals.  But even accepting

that the Platforms will need to engage in efforts to validate transactions before completing them, incidental burdens like these are not always sufficient to trigger First Amendment scrutiny. *See Int'l Franchise Ass'n*, 803 F.3d at 408 ("[S]ubjecting every incidental impact on speech to First Amendment scrutiny 'would lead to the absurd result that any government action that had some conceivable speech inhibiting consequences . . . would require analysis under the First Amendment.'" (quoting *Arcara*, 478 U.S. at 708 (O'Connor, J., concurring))). Furthermore, to the extent that the speech chilled advertises unlawful rentals, "[a]ny First Amendment interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973).

Finally, because the Ordinance does not implicate speech protected by the First Amendment, we similarly reject the Platforms' argument that the Ordinance is unconstitutional without a scienter requirement. In most cases, there is no "closed definition" on when a criminal statute must contain a scienter requirement. *See Morissette v. United States*, 342 U.S. 246, 260 (1952). However, the Supreme Court has drawn a bright line in certain contexts, such as holding that the First Amendment requires statutes imposing criminal liability for obscenity or child pornography to contain a scienter requirement. *See New York v. Ferber*, 458 U.S. 747, 765 (1982). Such a requirement prevents "a severe limitation on the public's access to constitutionally protected matter" as would result from inflexible laws criminalizing "bookshops and periodical stands." *Smith v. California*, 361 U.S. 147, 153 (1959).

Here, even assuming that the Ordinance would lead the Platforms to voluntarily remove some advertisements for lawful rentals, there would not be a "severe limitation on the public's access" to lawful advertisements, especially considering the existence of alternative channels like Craigslist. *Id.* Such an incidental burden is far from "a substantial restriction on the freedom of speech" that would necessitate a scienter requirement. *Id.* at 150. Otherwise, "[t]here is no specific constitutional inhibition against making the distributors of good[s] the strictest censors of their merchandise." *Id.* at 152.

## III. Remaining Claims

On appeal, the Platforms do not challenge dismissal of their other federal law claims "in light of the district court's interpretation of the Ordinance as only requiring disclosure of information pursuant to requests that comply with the Fourth Amendment and Stored Communications Act." Similarly, the parties specified that they would "not challenge the district court's decision to decline supplemental jurisdiction if all the Platforms' federal claims were properly dismissed." Accordingly, we need not consider the remaining claims.

\*     \*     \*

Because the district court properly dismissed the Platforms' complaints for failure to state a claim, we dismiss as moot the appeals from the denial of preliminary injunctive relief.

**AFFIRMED in part, DISMISSED in part.**